IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE NAGHMOUCHI | ) | CASE NO: |
| 5175 Longton Road | ) | |
| Lyndhurst, Ohio, 44124 | ) | JUDGE: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **COMPLAINT FOR DECLARATORY** |
| STRATEGIC EDUCATION | ) | **JUDGMENT, DAMAGES AND** |
| TECHNOLOGIES, LLC | ) | **INJUNCTIVE RELIEF** |
| c/o Stat. Agent, CT Corporation System | ) | |
| 440 Easton Commons Way, Ste 125 | ) | |
| Columbus, Ohio, 43219 | ) | |
| | ) | (Jury Demand Endorsed) |
| -and- | ) | |
| | ) | |
| COLLEGE PLANNING NETWORK, LLC | ) | |
| c/o Stat. Agent, CT Corporation System | ) | |
| 440 Easton Commons Way, Ste 125 | ) | |
| Columbus, Ohio, 43219 | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Michelle Naghmouchi, by and through undersigned counsel, as her Complaint against Defendants, states and avers the following:

## PARTIES.

1. Naghmouchi is an individual residing in Cuyahoga county, Ohio.

2. Strategic Education Technologies, LLC ("SET") is a domestic limited liability corporation with its principal place of business located in Cuyahoga county, Ohio.

3. College Planning Network ("CPN") is a foreign limited liability corporation with its principal place of business located in Cuyahoga county, Ohio.

4. During all times material to this Complaint, SET and CPN (hereinafter, "Defendants") were Naghmouchi's "employer" within the meaning of Section 3(d) of the Fair Labor Standards

Act ("FLSA"), 29 U.S.C. § 203(d); Section34a, Article II, of the Ohio Constitution; and the

Ohio Minimum Fair Wages Standards Act ("OMWFSA").

## PERSONAL JURISDICTION.

5.   Defendants hire citizens of the state of Ohio, contract with companies in Ohio, and own or

rent property in Ohio. As such, the exercise of personal jurisdiction over Defendants comports

with due process.

6.   Naghmouchi performed work in this judicial district, was paid unlawfully by Defendants

pursuant to work performed in this district and/or was hired out of this district.

7.   This cause of action arose from or relates to the contacts of Defendants with Ohio residents,

thereby conferring specific jurisdiction over Defendants.

## SUBJECT MATTER JURISDICTION AND VENUE.

8.   This Court has jurisdiction over the subject matter of this action under the FLSA, 29 U.S.C. §

216(b) and 28 U.S.C. § 1331.

9.   This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Naghmouchi's state law

claims because those claims derive from a common nucleus of operative facts.

10.  Venue is proper in this District because Defendants do a sizeable portion of their business in

this District, and all of the wrongs herein alleged occurred in this District.

## COVERAGE.

11.  At all times referenced herein, Defendants formed a single enterprise within the meaning of

Section 3(r) of the FLSA, 29 U.S.C. § 203(r); and formed a single enterprise engaged in

commerce within the meaning of Section 3(s)(1) of the Fair Labor Standards Act ("FLSA"),

29 U.S.C. § 203(s)(1)(A)(ii), in that said enterprise at all times hereinafter mentioned had

employees engaged in commerce or in the production of goods for commerce, or employees

handling, selling or otherwise working on goods or materials that have been moved in or

produced for commerce by any person and in that enterprise had an annual gross volume of sales made or business done of not less than $500,000.00.

12. At all times relevant to this Complaint, Naghmouchi was subject to "individual coverage" under the FLSA because she was engaged in commerce between the states on behalf of Defendants when she performed her primary job duties.

## FACTUAL ALLEGATIONS.
### (Background Facts Relating To Naghmouchi's Hiring).

13. SET and CPN are affiliated companies that provide college admissions, financial aid, college counseling and funding services, along with related financial products and services.

14. Naghmouchi is a former employee of Defendants.

15. Naghmouchi first began working for Defendant in or around September of 2016 as a "short-term" or "temporary" employee.

16. Upon Naghmouchi's initial hiring, Defendants told her she was an "independent contractor" and paid her on a 1099 basis.

17. Defendants did not require Naghmouchi to sign a confidentiality agreement or non-compete agreement when she was initially hired in September of 2016.

18. Despite being labeled by Defendants as an independent contractor, Naghmouchi was an employee of Defendants within the meaning of R.C. § 4112.01(A)(3).

19. Through July 31, 2017, Naghmouchi's job title was "Seasonal Data Support."

20. Naghmouchi's job as Seasonal Data Support was an entry-level job that required no special experience or prior training.

21. Through July 31, 2017, Naghmouchi's primary job duties were to gather information from Defendants' clients for the purposes of completing financial aid applications for college.

22. Through July 31, 2017, Naghmouchi was not assigned any clients of her own.

23. Through July 31, 2017, Naghmouchi was paid on an hourly basis.

3

24. Naghmouchi's work was integral to Defendants' business.

25. Despite the title "seasonal," Naghmouchi's employment was not temporary and had no fixed end-date.

26. Naghmouchi was not required to use managerial skills to realize a profit or a loss; she was paid an hourly rate determined solely by Defendants.

27. Naghmouchi was economically dependent on Defendants and did not invest her own money, equipment, or supplies into the business.

28. Naghmouchi was not conducting her own business while in the employ of Defendants.

29. At all times material to the complaint, Defendants controlled Naghmouchi's employment.

30. Any and all training Naghmouchi received from Defendants in connection with her work was provided to Naghmouchi while she was working in the role that Defendant's labeled as an "independent contractor."

31. Defendants knew that Naghmouchi was never truly an "independent contractor."

32. Defendants never believed that Naghmouchi was truly an "independent contractor."

33. Defendants have misclassified several employees as "independent contractors."

34. On or about August 1, 2017, Defendants hired Naghmouchi from an "independent contractor" role to an employee.

35. Naghmouchi was told that the purpose of transitioning her from an "independent contractor" status to that of an employee was to make her employment with Defendants "official."

36. As an employee of Defendants, Naghmouchi continued to perform the same basic entry-level work that she had performed when she was treated as an "independent contractor" by Defendants.

37. Naghmouchi did not receive any additional training when Defendants changed her classification to an employee.

4

38. Upon information and belief, Defendants maintain an unlawful practice of misclassifying entry-level employees as "independent contractors" during the first several months of their employment.

**(Facts Related to Defendants' Violations of the FLSA).**

39. Naghmouchi continued to be paid hourly after she became an employee.

40. From August 1, 2017 through Naghmouchi's last day of employment with Defendants, she was scheduled to work from 7:30am through 4:30pm, five days a week, for a total of nine (9) hours per day or 45 hours per week.

41. From August 1, 2017 through Naghmouchi's last day of employment with Defendants, Defendants had a practice of automatically deducting one hour from Naghmouchi's daily hours for the purposes of a lunch break.

42. From August 1, 2017 through Naghmouchi's last day of employment with Defendants, she sat in a cubicle near Janasek's office.

43. Naghmouchi regularly worked through her lunch due to her workload.

44. Naghmouchi frequently ate at her desk while she worked through her lunch break.

45. On several occasions, Janasek approached Naghmouchi as she was eating and working to discuss work related matters.

46. On one or more occasions, Janasek asked Naghmouchi why she was eating at her desk and whether she planned on taking on lunch, to which Naghmouchi would reply "I can't today" or "I am too busy" or  "I wish I could," or would use words to that effect.

47. Janasek responded to learning that Naghmouchi had not taken a lunch by telling Naghmouchi "that sucks" and/or by expressing empathy for Naghmouchi's situation.

48. Janasek did not tell Naghmouchi that she was required to take a lunch.

49. Janasek did not tell Naghmouchi that she was required to report that she had worked through her lunch.

50. Janasek did not discipline Naghmouchi for working through her lunch or tell her to stop.

51. In or around the spring of 2018, Naghmouchi asked Janasek if she could get paid for working through her lunch.

52. Janasek responded to Naghmouchi's request to be paid for working through lunch by stating "if you don't take your lunch, that's on you."

53. Based on Janasek's response, Naghmouchi tried to reduce how often she worked through lunch but often was unable to do so.

54. As a result of Naghmouchi's regularly working through her lunch break, she often worked in excess of 40 hours per week.

55. As a result of Naghmouchi's regularly working through her lunch break, which she was discouraged from reporting, Defendants failed to pay Naghmouchi for all overtime hours she worked.

**(Facts Related to Defendants' Tortious Interference in Naghmouchi's Subsequent Employment Relationship).**

56. When Defendants reclassified Naghmouchi as an employee, Defendants provided Naghmouchi with numerous documents to sign, including an employment agreement ("Employment Agreement").

57. A true and accurate copy of the Employment Agreement is attached hereto as "Exhibit A."

58. The Employment Agreement is boilerplate and provides no specifics as to Nagamouchi or her position besides her name at the top and her signature on the last page.

59. Lisa Janasek, a "HR Representative" for CPN, gave Naghmouchi the Employment Agreement and pointed where to sign without giving her a chance to read it.

60. Unbeknownst to Naghmouchi at the time, Defendants included a non-disclosure provision, a non-solicitation provision, and a non-compete provision in her Employment Agreement.

61. Upon information and belief, Defendants require all of their employees to sign boiler-plate non-compete agreements without regard to the position held by the employee, whether the employee has access to proprietary or confidential information, or whether the agreements are necessary to protect the legitimate interest of Defendants.

62. No one told Naghmouchi that the Employment Agreement included a non-disclosure provision and non-compete provision.

63. No one discussed the non-disclosure provisions and non-compete provisions with Naghmouchi at any time during her employment.

64. Naghmouchi was not advised to speak with her own legal counsel prior to signing the employment agreement.

65. The only thing that Defendants ever told was "confidential" was the financial information of Defendants' clients.

66. Defendants never told Naghmouchi that anything she was working with or working on as an employee was considered a "trade secret" or was "proprietary."

67. Naghmouchi was never exposed to and does not possess any proprietary or trade secret information of Defendants.

68. Naghmouchi was not the sole contact with any of Defendants' clients.

69. Naghmouchi did not obtain any unique or extraordinary skills through her employment with Defendants.

70. The non-compete provision contained in Naghmouchi's Employment Agreement contains no geographical limits.

71. The non-compete provision contained in Naghmouchi's Employment Agreement purports to prevent Naghmouchi from working for any competitor in any capacity whatsoever.

72. The non-compete provision contained in Naghmouchi's Employment Agreement purports to prevent Naghmouchi from soliciting or conducting business with any customer or client of Defendants, including those customers and clients Naghmouchi never worked with and would have no reason to know are customers and clients of Defendants.

73. The non-compete provision contained in Naghmouchi's Employment Agreement contains an 18-month limitation and a tolling provision.

74. The benefit to Defendants in enforcing the non-compete provision against an entry-level, hourly employee like Naghmouchi is nominal.

75. The benefit to Defendants in enforcing the non-compete provision against an entry-level, hourly employee like Naghmouchi is far outweighed by the detriment to Naghmouchi.

76. The non-compete provision contained in Naghmouchi's Employment Agreement has had a detrimental impact on Naghmouchi's ability to earn a living and to obtain employment providing better pay, working conditions, and benefits than Defendants provided her with.

77. Upon information and belief, Defendants have a practice of abusing non-compete agreements for the purpose of eliminating all competition and oppressing their low wage employees.

78. The non-compete provision is so broad that it practically limits all competition and not just unfair competition.

79. The non-compete provision contained in Naghmouchi's Employment Agreement is unenforceable as a matter of law.

80. At all times referenced herein, Defendants knew, or had reason to know, that the non-compete provision contained in Naghmouchi's Employment Agreement was unenforceable.

81. By the spring of 2019, Naghmouchi had grown dissatisfied with her employment with Defendants.

82. In or around April of 2019, Naghmouchi began searching for other employment opportunities.

83. In or around June of 2019, Naghmouchi applied for a position doing data entry and customer service work with POM College Consulting, LLC ("POM").

84. In or around early July of 2019, Naghmouchi interviewed with POM.

85. Shortly thereafter, POM offered Naghmouchi a position.

86. POM offered Naghmouchi a higher rate of pay than she was receiving from Defendants.

87. The position POM offered Naghmouchi would allow her to work from home.

88. Naghmouchi accepted POM's offer of employment.

89. Naghmouchi resigned from her employment with Defendants on or about July 15, 2019.

90. On or about November 11, 2019, Defendants sent a letter to POM informing POM of Naghmouchi's non-compete and alleging, without basis, that Naghmouchi "has been sharing CPN and SET's confidential information and trade secrets with…POM…in violation of  the confidentiality provisions of the Employment Agreement and Ohio Uniform Trade Secrets Act." ("Non-Compete Letter")

91. A true and accurate copy of the Non-Compete Letter is attached hereto as Exhibit "B."

92. Naghmouchi had not been sharing CPN's confidential information and trade secrets with POM.

93. Defendant did not have any evidence that Naghmouchi had been sharing CPN's confidential information and trade secrets with POM when it sent the Non-Compete Letter.

94. Naghmouchi had not been sharing SET's confidential information and trade secrets with POM.

95. Defendant did not have any evidence that Naghmouchi had been sharing CPN's confidential information and trade secrets with POM when it sent the Non-Compete Letter.

96. The Non-Compete Letter does not identify the alleged confidential information at issue.

97. The Non-Compete Letter does not identify the alleged trade secrets at issue.

98. In the Non-Compete Letter, Defendants threatened to sue POM and Naghmouchi unless POM terminated Naghmouchi.

99. Naghmouchi was unaware that she had signed a non-compete or confidentiality agreement with Defendants until Defendants sent POM the Non-Compete Letter.

100. POM was unaware that Naghmouchi has signed a non-compete or confidentiality agreement with Defendants until it received the Non-Compete Letter.

101. Disbelieving that she had in fact signed a non-compete or confidentiality agreement with Defendants, Naghmouchi emailed Defendants seeking a copy of the Employment Agreement.

102. Defendants provided Naghmouchi with a copy of the Employment Agreement on or about November 14, 2019.

103. Subsequently, Naghmouchi provided POM with a copy of her Employment Agreement.

104. On or about November 15, 2019, POM terminated Naghmouchi's employment.

105. POM provided Defendants with written notification of Naghmouchi's termination.

106. POM terminated Naghmouchi because of Defendants' threats to take legal action against POM if they did not terminate Naghmouchi.

107. There were no other factors in POM's decision to terminate Naghmouchi besides Defendants' threats to take legal action against POM.

108. Defendants acted in bad faith in sending the Non-Compete Letter.

109. Defendants had no reason to believe that Naghmouchi had been "sharing" proprietary information or trade secrets with POM because Naghmouchi was not aware of and had not been exposed to any such information during her employment with Defendants.

110. Defendants had no evidence that POM had actually engaged in any wrongdoing but were merely suspicious because of POM's hiring of Naghmouchi.

111. Defendants knew that the non-compete agreement was unenforceable but interfered with Naghmouchi's employment anyways.

112. Upon information and belief, Defendants leveraged Naghmouchi's non-compete agreement for the improper purpose of attempting to "build" a case against POM and not because Defendants genuinely believed that the non-compete was enforceable against Naghmouchi.

113. Upon information and belief, Defendants leveraged Naghmouchi's non-compete agreement for the improper purpose of driving a wedge between Naghmouchi and POM in hope that Naghmouchi would be motivated to provide Defendants with information about POM's operations and/or to share POM's own trade secrets with Defendants so that Defendants could manufacture a basis for pursuing legal claims against POM.

114. Subsequently, Defendants legal counsel, David Waltz, called Naghmouchi and began to pressure her to provide a statement against POM in conformity with its theory that POM had misappropriated Defendants' information.

115. Sensing Waltz was trying to trap her or put words in her mouth, Naghmouchi made up an excuse to promptly end her call with Waltz.

116. Subsequently, Waltz repeatedly called Naghmouchi.

117. Naghmouchi did not answer Waltz's calls.

118. On or about December 14, 2020, Waltz sent Naghmouchi a letter in which he threatened to sue Naghmouchi on behalf of Defendants "unless [Naghmouchi saw] the wisdom in cooperating in this matter." ("Threat Letter").

119. A true and accurate copy of Waltz's December 14, 2019 letter to Naghmouchi is attached hereto as Exhibit "C."

120. Naghmouchi did not respond to the Threat Letter.

121. On January 30, 2020, Defendants and one of their affiliated companies, Strategic College Funding Solutions, Inc., filed suit against POM and Rose in the Cuyahoga County Court of Common Pleas, Case No CV-20-928689 ("POM Lawsuit").

122. Defendants named POM, Rose, and two "Jane Does" as Defendants in the POM Lawsuit ("POM Lawsuit Defendants").

123. In the POM Lawsuit, Defendants alleged, *inter alia*, that the POM Lawsuit Defendants had misappropriated their alleged "trade secrets"; tortuously interfered with its business; and had participated in a civil conspiracy.

124. The POM Lawsuit describes Naghmouchi as one of the Jane Does.

125. The POM Lawsuit listed the Jane Does as defendants even though Defendants knew their identity.

126. At the time Defendants filed the POM Lawsuit, they had no evidence that the POM Lawsuit Defendants had misappropriated any trade secrets or had engaged in a conspiracy to interfere with its business.

127. At the time Defendants filed the POM Lawsuit, they were unable to identify any legally cognizable "trade secrets" that the POM Lawsuit Defendants had allegedly misappropriated.

128. Defendants named name Naghmouchi in the POM Lawsuit as a "Jane Doe" in order to leverage her "cooperation" against POM and Rose.

129. In filing the POM Lawsuit, Defendants wanted to gain Naghmouchi's cooperation so they could learn of POM's business practices for the purposes of manufacturing and/or "molding" their specious trade secret claims around what they learned.

130. During the POM Lawsuit litigation, Defendants were incapable of identifying any legally cognizable "trade secrets" that the POM Lawsuit Defendants had allegedly misappropriated in discovery.

131. On July 24, 2020, Defendants voluntarily dismissed the POM Lawsuit.

132. As a result of Defendants' Conduct, Naghmouchi has suffered and continues to suffer damages.

## COUNT I: FAILURE TO PAY OVERTIME IN VIOLATION OF THE FLSA
## (29 U.S.C. § 207).

133. Naghmouchi restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

134. The FLSA requires each covered employer such as Defendants to compensate all non-exempt employees at a rate of not less than 1.5 times the regular rate of pay for all work performed in excess of forty (40) hours in a work week.

135. Naghmouchi was not exempt from the right to receive overtime pay under the FLSA.

136. Naghmouchi is entitled to be paid overtime compensation for all overtime hours she worked.

137. At all times relevant to this action, Defendants willfully failed and refused to pay Naghmouchi overtime wages (of time and one-half of at least the applicable Ohio minimum wage) for all hours worked, as required by the FLSA, in amounts to be proven at trial.

138. Defendants recklessly failed to investigate whether their failure to pay Naghmouchi an overtime wage (of time and one-half of at least the applicable Ohio minimum wage) for all of the overtime hours worked during the relevant time period violated the Federal Wage Laws of the United States.

139. Alternatively, Defendants intentionally misled Naghmouchi to believe that Defendants were not required to her all overtime wages due.

140. Alternatively, Defendants concocted a scheme pursuant to which they deprived Naghmouchi of the full amount of overtime pay she earned.

141. As a result of Defendants' failure to properly compensate Naghmouchi at a rate not less than 1.5 times the regular rate of pay for all work performed in excess of 40 hours in a work week, Defendants violated the FLSA, 29 U.S.C. §§ 201 et. seq., including 29 U.S.C. § 207(a)(1) and § 215(a).

142. Defendants' conduct as alleged herein constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

143. Naghmouchi is entitled to damages in the amount of her unpaid overtime compensation, plus liquidated damages as provided by the FLSA, 29 U.S.C. § 216(b), and other such legal and equitable relief as the Court deems just and proper, including her attorneys' fees and costs.

## COUNT II:  VIOLATION OF THE OHIO MINIMUM FAIR WAGE STANDARDS ACT, O.R.C. § 4111.01, *et seq.*

144. Naghmouchi restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

145. The OMFWSA requires that covered employees be compensated for every hour worked in a workweek including payment of all earned overtime compensation. *See* R.C. §§ 4111.01, *et seq*.

146. Defendants violated the OMFWSA with respect to Naghmouchi by failing to pay Naghmouchi overtime compensation for any hours she worked over 40 in a week.

147. As a direct and proximate result of Defendants' unlawful conduct, Naghmouchi has suffered and will continue to suffer a loss of income and other damages.

148. Having violated the OMFWSA, Defendants are liable to Naghmouchi pursuant to R.C. § 4111.10 for the full amount of her unpaid overtime and for costs and reasonable attorneys' fees.

**COUNT III:  VIOLATION OF THE OHIO PROMPT PAYMENT ACT, O.R.C. § 4113.51.**

149. Naghmouchi restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

150. The Ohio Prompt Pay Act ("OPPA") required Defendants to pay Naghmouchi all wages, including unpaid overtime, on or before the first day of each month, for wages earned by Naghmouchi during the first half of the preceding month ending with the fifteenth day thereof, and on or before the fifteenth day of each month, for wages earned by Naghmouchi during the last half of the preceding calendar month. *See* O.R.C. § 4113.15(A).

151. Naghmouchi was not paid all wages due within 30 days of her performing the work that entitled her to overtime. *See* R.C. §4113.15(B).

152. Naghmouchi unpaid wages remain unpaid for more than 30 days beyond her regularly scheduled payday.

153. Naghmouchi has been harmed and continues to be harmed by CPN and SET's acts and/or omissions as described herein.

**COUNT IV: ACTION FOR DECLARATORY JUDGMENT.**

154. Naghmouchi restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

155. The non-compete provision contained in Naghmouchi's Employment Agreement are unenforceable by Defendants for the following reasons:

   a. It is in contravention of the laws of the state of Ohio because of excessive restrictions as to time (18 months) and as to area (effectively, the entire world), and because it seeks to prohibit Naghmouchi from working with, working for, or soliciting customers or clients of Defendants with whom Naghmouchi did not have personal contact when she was employed by Defendants;

b.  It purports to prohibit Naghmouchi from conducting business with Defendants prospective customers and clients with whom Naghmouchi did not have personal contact while she was employed by Defendants;

c.  The restrictions purport to restrict to prohibit Naghmouchi from working in areas far beyond that in which her personal services were actually provided to Defendants;

d.  It is a restraint of trade, against public policy, unduly harsh and oppressive, and constitutes an attempt on the part of Defendants to interfere with Naghmouchi's efforts to earn a livelihood in the are of her choice; and

e.  The restrictions are impermissibly broad in that it attempts to protect far more than Defendants legitimate need for protection and such restrictions are greater than reasonably necessary to protect Defendants in any legitimate interest.

156.  Defendants have asserted their intention of enforcing the Employment Agreement and have used threats to enforce the agreement for the purpose of interfering with employment Naghmouchi obtained subsequent to her employment with Defendants.

157.  Unless restrained by this Court, Naghmouchi would be unable to maintain the employment and relationships she desires in order to earn a livelihood in her area of business.

158.  Unless restrained by this Court, Defendants interference with Naghmouchi's prospective employers and threats to involve them in litigation will cause Naghmouchi severe, permanent, and irreparable injury, not measurable in monetary damages.

159.  Naghmouchi has no plain, practical, or adequate remedy at law for Defendants actions and threatened actions.

## COUNT V: TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONSHIP

160.  Naghmouchi restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

161. As of July of 2019, Naghmouchi had entered into an employment relationship with POM.

162. Subsequently, CPN and SET became aware of Naghmouchi's employment relationship with POM.

163. CPN and SET, as outsiders to Naghmouchi's employment relationship with POM, maliciously and intentionally induced POM to terminate Naghmouchi's employment.

164. CPN and SET interfered in Naghmouchi's employment with POM for improper purposes and without justification or privilege.

165. Upon information and belief, CPN and SET interfered with Naghmouchi's employment for the sole purpose of manufacturing a "witness" they could use to pursue groundless and specious claims against POM.

166. As a direct and proximate result of CPN and SET's acts and/or omissions as described herein, Naghmouchi has been harmed and continues to be harmed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Michelle Naghmouchi requests judgment against all Defendants and for an Order:

(a) Providing a temporary injunction enjoining and restraining Defendants from enforcing the non-compete provision contained in Plaintiff's Employment Agreement and in any other manner interfering in Plaintiff's business;

(b) Issuing a declaratory judgment finding and decreeing that the non-compete provision of Plaintiff's Employment Agreement is void and unenforceable;

(c) Providing a permanent injunction retraining Defendants enforcement of the non-compete provision of Plaintiff's Employment Agreement and Defendants' assertion to anyone of its validity and enforceability;

(d) Issuing a declaratory judgment that the practices complained of herein are unlawful under the FLSA, 29 U.S.C. §§ 201 et seq.;

(e) Issuing a declaratory judgment that Defendant violated the recording-keeping requirements of the FLSA, 29 U.S.C. §§ 201 et. seq., including 29 U.S.C. § 211(c) and § 215(a), and the OMWFSA, R.C. § 4111.08;

(f)  Awarding Plaintiff unpaid minimum wages and overtime wages and an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b);

(g)  Awarding Plaintiff all remedies provided for by the OPPA, including interest and/or $200.00, whichever is greater;

(h)  Awarding damages, including actual, economic, non-economic, general, special, incidental, statutory, punitive, treble, liquidated, and consequential to Plaintiff in an amount to be determined at trial;

(i)  Awarding pre-judgment and post-judgment interest as provided by law;

(j)  Awarding reasonable attorneys' fees and costs; and

(k)  Awarding such other and further relief that this Court deems appropriate.

Respectfully submitted,

/s/ *Chris P. Wido*
Brian D. Spitz (0068816)
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Boulevard, Suite 200
Beachwood, Ohio 44122
Phone:  (216) 291-4744
Fax:     (216) 291-5744
Email:  brian.spitz@spitzlawfirm.com
            chris.wido@spitzlawfirm.com

*Attorneys for Plaintiff Michelle Naghmouchi*

## **JURY DEMAND**

Plaintiff Michelle Naghmouchi demands a trial by jury by the maximum number of jurors permitted.

/s/ Chris P. Wido
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**
*One of the Attorneys for Plaintiff Michelle Naghmouchi*